1831.

THE UNITED STATES OF AMERICA *vs.* CROOKSHANK and wife, M'GILL and others.

THE UNITED
STATES
*v.*
CROOK-
SHANK.

The act of Congress of the second day of May, 1799, which gives the United States a priority of payment in cases of insolvency or where any estate in the hands of executors, administrators or assignees is not sufficient, does not give a priority out of the real estate or the proceeds of real estate belonging to or vested in the heirs of the debtor.

The priority given in cases of insolvency relates to living debtors: 1. Where the debtor, not having sufficient to pay all his debts, makes a voluntary assignment for the benefit of his creditors of all his estate. 2. Where the estate of an absconding, concealed or absent debtor has been attached. 3. Where an act of legal bankruptcy has been committed.

The priority given in the event of the death of the debtor arises, after his estate has passed to executors or administrators. Congress has no where subjected the real estate in the hands of the heir to the payment of the debts contracted by the ancestor with the government.

Where a mortgagor, for his own advantage, yet in good faith, procures satisfaction-pieces from his mortgagees and cancels the mortgages, without paying the mortgage moneys, and does so upon an understanding to give new mortgages but dies before accomplishing it, and his heirs give such new mortgages: *Held*, they should have the same effect as the old securities subject to intervening rights; and that the U. S. were not entitled to come in for the amount of duties secured upon bonds afterwards given by the deceased mortgagor rateably with the mortgagees.

*December 31,
1831.*

*Priority of
the United
States out of
the real estate
of a deceased
obligor.
Effect of
mortgages
substituted for
others which
had been can-
celled but not
satisfied.*

DAVID R. Lambert of the city of New York had given to the defendants, George Crookshank and John —— M'Gill, respectively, bonds and mortgages, for securing moneys honestly due to them, upon different parts of his real estate in the city of New York. A long time after, and on the seventh day of May one thousand eight hundred and twenty-five, he gave a bond at the custom-house for securing the duties upon goods imported by him. It was made payable nine months after date. On the twenty-eighth day of the same month he gave a bond, for a similar purpose, which was made payable in twelve months from its date. In the year 1824, or the beginning of

30

1825, he had, upon an expectation of selling the property covered by the mortgages, requested the defendants, Crook-shank and M'Gill, to place satisfaction-pieces in his hands, for the purpose of using them when necessary and thereby can-celling their mortgages; and, from the great confidence they had in his integrity and upon his verbal and written assurances of substituting new mortgages for their several debts (provided he availed himself of the satisfaction-pieces,) they complied with his wish. On the fifth day of May, 1825, he filed the satisfaction-pieces; and thereby caused the mortgages to be cancelled of record: but this was done without his paying any part of the mortgage moneys. He died on the third day of June, 1825; and the suddenness of his death deprived him of the opportunity of reinstating the securities. He was a mer-chant of good standing and supposed to be abundantly able to meet all his engagements. The bonds at the custom-house were given in the usual course of business, with a surety in each. There was no pretension or appearance of his having obtained credit there in consequence of removing the mort-gages from his property.

The heirs of David R. Lambert were satisfied of his inten-tion to give new mortgages in the place of those which were cancelled; and on the sixth day of March, 1826, they executed mortgages to the defendants, Crookshank and M'Gill, respec-tively, for the amounts of their original bond debts.

David R. Lambert's estate was insolvent; there was no personal property in the hands of his administrator to satisfy the custom-house bonds; and the sureties therein turned out also insolvent.

Upon a sale of the real estate of Lambert under decrees of foreclosure and sale, upon certain mortgages given by him prior to those of Crookshank and M'Gill, a surplus had come into this court.

An information was filed by the United States District Attorney, in behalf of the United States, seeking to obtain payment of the custom-house bonds out of this surplus.

Mr. *James A. Hamilton, U. S. District Attorney*, for the complainants, argued the case upon the following points:

I. The United States are entitled to a priority of payment out of the estate of David R. Lambert, deceased.

II. The estate of David R. Lambert, deceased, in the hands of his administrator and in the possession of his heirs, is liable to the payment of his debts.

Mr. *George Griffin*, for the defendants, based his argument upon these points:

I. The United States have no right of priority to real estate or the proceeds thereof in the hands of the heirs of their debtor.

II. At all events, such right of priority does not prevail until the property or its proceeds have actually reached the hands of the heirs.

III. The defendants, George Crookshank and John M'Gill, are, under the circumstances stated in their answers, respectively entitled to the surplus moneys arising from the sale of the mortgaged premises first and secondly mentioned in the bill of complaint in this cause.

THE VICE-CHANCELLOR. The question in this case is, whether the surplus remaining in court should be applied towards the debts of these defendants, mortgagees, in virtue of their respective liens, or whether the United States are entitled to a priority of payment of the two bonds?

The United States assert no lien upon the funds in court, but claim a priority of payment under the 65th section of the act of Congress of the 2d day of March, 1799. This section provides, that, " in all cases of insolvency or where any estate " in the hands of executors, administrators or assignees shall " be insufficient to pay all the debts due from the deceased, " the debts due to the United States on any bond or bonds for " the payment of duties shall be first satisfied; and any exe- " cutor, administrator or assignees, or other person who shall

*1831.*

THE UNITED STATES
*v.*
CROOK-SHANK.

*February 27,*
*1832.*

" pay any debt due by the person or estate from whom or for
" which they are acting previous to the debt or debts due to
" the United States from such person or estate being first duly
" satisfied and paid, shall become answerable, in their own
" person and estate for the debt or debts so due to the United
" States, or so much thereof as may remain due and unpaid:
" and actions or suits at law may be commenced, &c."

Does this right of priority extend to real estate or the pro-
ceeds of real estate in the hands of the heirs of the debtor?
Here is the first and principal question.

It is somewhat surprising this question has never been judi-
cially determined. Among the variety of points which have
arisen under the statute, this one appears not to have been
presented before; and I could almost regret it has fallen to my
lot to be the first to express a judicial opinion upon the subject.
Whether the humble decision I am about to pronounce is to be
regarded as giving to the statute its true construction in this
particular, time alone will show.

The section of the act under consideration is certainly
broader and more comprehensive in its terms than the sections
upon the same subject in the original act of 1789, and the sub-
sequent act of 1790, (both long since repealed,) or the fifth
section of the act of the third day of March, 1797, which re-
mains in force and applies to other bonds or debts due to the
United States, besides those for duties. Nevertheless, the
principle in all these acts is the same; and it must be admitted,
that the right of priority or precedence which they assert is
in derogation of the common law rights of the debtor to create
preferences among his creditors, and also of the rights of
creditors to obtain legal preferences or, at all events, an
equality of distribution of the debtor's estate in the event of
his death or insolvency. It is, therefore, a statute to be con-
strued strictly, as was well observed by Chief Justice Parker in
*Watkins* v. *Otis*, 2 *Pick.* 102, where he says, " the government
" which has the power to take, should never be allowed more
" than, by express terms, it demands: for the doctrine of impli-
" cation here might swallow up all individual rights." Upon the
idea of a strict construction also, the courts of the United

States have acted in determining what are " cases of insol- "vency" giving a priority of payment out of an estate in the hands of assignees; they have uniformly held it to be not merely an inability of the debtor to pay all his debts which gives the right, but an insolvency manifested by some open and notorious act by which the debtor is divested of all his property under some insolvent law or by voluntary assignment, not of a part but of the entire of his estate: 1 *Peters' C. C. R.* 195; 1 *Paine's C. C. R.* 188, 629; 3 *Cranch*, 73; 8 *Ib.* 431; 2 *Wheat.* 396. Under the same view, Mr. Justice Story proceeded to deliver the elaborate opinion of the court in the case of *Conrad* v. *The Atlantic Insurance Company*, 1 *Peters*, 386, in which he took occasion to consider the nature and effect of this priority and reviewed all the cases decided by the supreme court upon the subject. The cases of insolvency within the 65th section, he there shows, relate to living debtors, and are divisible into three classes: 1. Where the debtor, not having sufficient to pay all his debts, makes a voluntary assignment of all his property for the benefit of his creditors; 2. Where the estate and effects of an absconding, concealed or absent debtor have been attached; and, 3. Where an act of legal bankruptcy has been committed.

In none of these cases, however, is a lien created. A mere right of priority of payment or satisfaction out of the general funds of the debtor in the hands of the assignees is only declared; and in relation to this, the assignees are made personally accountable to the United States. I advert to this view of the law for the purpose of showing that the term " assignees," used in the statute, means only such persons as become vested with or possessed of the property of the living debtor in one or other of the cases of insolvency pointed out in the statute, and is not to be so extended as to embrace heirs or devisees or any other description of persons: for, assignees are not only distinguishable but are clearly distinguished in the law itself from those who succeed to the title and possession of property upon and in consequence of the demise of the debtor. Judge Story remarks, in the opinion just alluded to, that the case of the deceased debtor stands wholly upon the alternative

1831.

THE UNITED STATES
v.
CROOK-
SHANK.

contained in the statute: referring, undoubtedly, to the clause which speaks of the estate in the hands of executors and administrators as distinct from the property of insolvents which passes to assignees. Thus again showing how the terms "executors," "administrators" and "assignees," as used in the statute, have each their appropriate meaning, to be applied to their proper objects and not indiscriminately to the same object. And, hence, it is plain that the precedence of payment to which the United States are entitled can only arise when the property of their debtor has passed into the hands of assignees in the cases of insolvency and under the circumstances above mentioned, or when, in the event of the death of the debtor, his estate has passed to executors or administrators. It is only in such cases the priority is declared; and it would seem to follow, as a necessary consequence, since the right cannot be extended beyond the express words by which it is declared, that the priority does not exist in relation to real estate descended to heirs.

But it has been asked: what is meant by the words "or other person," in that part of the section which, after declaring the priority of payment, imposes the obligation or liability to pay? Were these words used to extend the preference to property other than such as passes to executors, administrators or assignees? I think not. The priority had already been created to this extent, but no further; and it was then deemed necessary to say, upon whom the responsibility should rest to make payment of such preferred debts, in order to insure a faithful application of the funds; and such responsibility is made to rest upon the executors, administrators and assignees or "other person," meaning the person who might have the property or funds in charge which had vested in the executors, administrators or assignees and to which the right of priority attached. Besides, it sometimes happens, that instead of the nominative "assignee," the person coming into possession of an insolvent's estate is called a trustee and garnishee, and the phrase "or other person" may have been intended to embrace them. In short, those words were introduced for the purpose of securing a faithful application of the funds which should

come to the hands of an executor, administrator, assignee or other representative of an insolvent's estate out of which the preference arises: but not for the purpose of extending such preference to other descriptions of property.

Some stress has been laid upon the word " estate," as being applicable to real, as well as personal property. It may, undoubtedly, embrace both. ·If it be real estate which passes to an assignee, the priority attaches; and if, by the laws of any particular State, executors or administrators are vested with a controul over the realty as well as over the personalty for the purposes of sale and'payment of debts, as is understood to be the case in some of the States of the Union, (and as is provided by our own State laws, authorizing proceedings before surrogates for the sale of real estate for such purposes,) I see no way of avoiding a priority which the United States will be entitled to, even out of real estate which may thus be sold. · But until sale is actually made and the proceeds are placed in the hands of executors or administrators, it is idle to talk of the priority in question; and in no event and under no circumstances, according to my judgment, can the right of priority attach whilst the real estate or its proceeds belong to or remain vested in the heir at law. The government has not, in terms, declared the right to that extent; and it is not for the courts to give the United States what they have not asked. Congress has no where, that I can discover, subjected the real estate in the hands of the heir to the payment of the debts contracted with the government by the ancestor. They may have had good reasons for the omission: the heir is so great a favorite of the common law, that his inheritance is not to be disturbed or broken into by the debts of his ancestor, except upon specialties in which the heir is expressly named and upon a deficiency of personal estate. This principle, however, has been done away in most of the States of the Union, by express statutory provision; but it is understood to be one of the vestiges of the common law still retained in Virginia: and it has, therefore, been well remarked in argument, that when Congress was about making the laws which created the preferences, the pride of the Virginia landholder may have

grappled with the proposed innovation and prevented its adoption..

Upon the whole and after mature consideration, I am satisfied the United States are not entitled to a priority of payment out of the funds in this court arising from the sale of the real estate of their debtor. The title is vested and remains in the heirs at law—subject however to the liens created upon the same.

But it is insisted, that if they are not entitled to a priority, they have, at all events, a right to come in with other creditors for a rateable proportion of the funds. This renders it necessary to consider whether, by virtue of the new mortgages or otherwise, the defendants, Crookshank and M'Gill, have liens upon the funds which entitle them respectively to a preference? I entertain no doubt whatever upon this branch of the case. Under the circumstances disclosed, these mortgages retained, as between them and David R. Lambert and by virtue of his promises and intention, an equitable lien upon his property for the full amount of their bonds; and after the cancelling of their mortgages of record, a court of equity would have compelled him to execute to them new mortgages according to his undertaking. This act was prevented by his death. His heirs, acting in good faith, have given new mortgage deeds; and I think the same effect is to be given to them as to the former securities—except so far as the rights of third persons may have intervened. The United States have not, by the creation of the debt to them and the mere taking of the bonds, acquired any such intervening rights, because they thereby acquired no lien; and their right of priority, as already shown, had not yet attached upon the property or funds in question, and even if it had attached it would not have divested the specific lien in favor of the mortgagees; see. 1 *Peter's Rep.* 441.

I shall; therefore, decree, that the United States are not entitled to a priority of payment nor have a right to come in with the mortgagees, as creditors, for a rateable part of the funds in court; but, on the contrary, the latter are entitled to the several amounts of surplus produced by the sale of the lands covered by their respective mortgages to the amount of their debts,

with costs of suit.   If there is any parcel of surplus on which
there is a specific lien, I see no objection to a rateable distribu-
tion of the same among the creditors, including the United
States.   In regard to this, however, there must first be an
account.