The following opinion of Judge Drummond, of the United States Circuit and District Courts for the District of Illinois, was delivered at the December term, 1850, of those Courts. The merit of the opinion was such, that at the request of a large number of the members of the bar, he prepared it for publication, and at the request of the same parties, it is published.

THE UNITED STATES }
v. } Circuit Court of United States for
E. C. DUNCAN, *et al.* } Illinois—December Term, 1850.

The judgments at law and decrees in chancery of the Circuit Court of the United States for the District of Illinois constitute a lien throughout the State, on the real estate of the party against whom they are rendered. This doctrine treated as the law of the Court, until the Supreme Court shall establish a different rule.

A person, who, at a judicial sale, purchases a tract of land, as the property of the party against whom the judgment is obtained, and pays the purchase money to the plaintiff cannot, as a general thing, call on him for repayment.

A sale of real estate of D., had taken place under a decree of this Court, O. became the purchaser of a piece of land, and paid the purchase money to the plaintiffs, but discovering that D. had no title to the land, made application to the Court to have the purchase money reimbursed out of moneys of the plaintiff's in Court; held, in the absence of fraud and unfair dealing, that this could not be done, but that being a judicial sale, O. must take the consequences of a defect or failure of title; and that the remedy was in equity against D. or his legal representatives.

If one partner withdraws funds from the partnership, and pays the taxes on his private estate, the creditors of the partnership do not, in general, thereby acquire a lien on the land. The estate of the partner is still his own private property, and, in case of his death, passes to his heirs or devisees subject to that debt as to others; and if his executors make a similar appropriation of the partnership funds the rule is the same.

Where it was alleged that A. and B were partners, and after A's death, his executors appropriated partnership property to the payment of taxes on his estate, and in expenses of administration, he being, at the time of his death, insolvent and indebted to the United States in judgments and otherwise, which judgments were a lien on the real estate of A., the lien of the United States and their priority of payment were not thereby affected, but they could enforce their judgments notwithstanding the acts of the executors.

When the partnership property is not sufficient to pay the debts of the firm, the priority of the United States does not reach the undivided interest of one of the partners in the partnership effects, if he is indebted to the United States, but when it has become his separate, individual property, the rule would be different. The true test is, whether the property belongs to the partnership or the individual.

The creditors of a partnership applied to the State Court by bill, to declare the

partnership, and decree the payment of the partnership debt, out of assets in the hands of the administrator of one of the partners who had died insolvent, indebted to the United States. The administrator denied the partnership and took an objection based on the debts of the United States and their priority. The State Court decreed in accordance with the prayer of the bill. The U. S. were not parties, and did not appear in the State Court. Held that the proceedings in the State Court did not impair the rights of the United States, and that they were not bound by th m, but that notwithstanding the decree in the State Court, the priority of the government attached, and that whenever the proceeds of any real estate, or any personal estate, cam · into the hands of the administrator, he became a trustee for the United States, and they must first be paid.

The acts of Congress, giving the United States a priority of payment, supe sede all State laws upon the subject of the distribution of those estates that come within their provisions. The law makes no exception in favor of a particular class of creditors, and the priority of the United States does not yield to the claims of any creditors, however high may be the dignity of their debts.

In June, 1841, the United States recovered judgments in the Circuit Court of the United States against D. Subsequently, in 1841 and 1842, other creditors obtained judgments in a State Court against him. These last judgments were liens only on the real estate of D. situate in the county where the judgments were recovered. In 1846, the U. S. obtained a decree in the Circuit Court of the United States, directing all of D.'s real property in the State, to be sold to pay an indebtedness to the United States, independent of the judgments of 1841. D. died in 1844, his whole property not being sufficient to pay the debts due the government. Under the decree of 1846, various sales took place of real estate, out of the County in which the other creditors had their judgment, and there was a fund in Court arising from these sales, sufficient to pay the judgments of the other creditors. The United States having sued out executions on the judgments of 1841, and levied them on lands situate in the county where the other creditors held their judgments, these creditors made application to this Court to compel the United States to go upon lands out of that county, to satisfy their judgments, or for the proceeds of the land sold out of that county. He'd, that however it might be in the case of private individuals, the United States, having an older lien made perfect by a levy, were entitled to retain it and sell the property to satisfy the judgments of 1841, and that the other creditors had no claim upon the proceeds in Court.

It is a rule well recognized and understood, that when a party has a lien for a debt in two funds, and another party has a lien on one of the funds only, a court of equity will oblige the party who has the double funds, to resort, in the first instance, for payment, to that fund upon which the other party has no lien. But this is never done when it trenches on the rights or operates to the prejudice of the party entitled to the double fund.

The case of Schuyler *v.* Teller, 9 Paige, 173, examined and distinguished from this. But this rule does not affect, under the circumstances of this case, the priority of the United States, neither is that priority affected by the rule settled in New York, that lands consisting of different parcels, subject to a general incumbrance, are in equity to be charged in the inverse order of the alienation of the several parcels.

It has been uniformly held in all the cases, that the priority of the United States does not disturb any specific lien, nor the perfected li n for a judgment, that is, it does not supersede a mortgage on land, nor a judgment made perfect by the issue of an execution and a levy on real estate. But in the case of a general lien it is not so clear.

The laws of the United States, giving a priority to the government, are of general application in the cases therein stated, and if a debtor is to be excepted out of the general rule, it devolves upon the party alleging the exception, to show it.

*Opinion, Delivered December 27th,* 1850.

In the year 1835, Joseph Duncan, whose representatives are the defendants in this case, became one of the sureties of William Linn, receiver of public moneys at Vandalia, in this State

The principal having failed to comply with the duties imposed on him by law, the sureties became liable on the bond given to the United States.

At the June term, 1841, of this Court, the United States recovered three several judgments at law, against the sureties. Duncan among others, for the aggregate sum of $29,191 05. At the time these judgments were obtained, none of the sureties, except Duncan, had any available property, and Linn, the principal, was insolvent. . On the 22d of December, 1843, the United States realized on these judgments, the sum of $23,532 65.

In January, 1844, Joseph Duncan died, disposing, by will, of his real and personal estate, but making no provision, other than the usual one for the payment of his debts, for the amount due the United States. At the time of his death, he was seized of a great many tracts of land lying in different counties of this State and in Morgan county, his place of residence.

The judgments of 1841, in this Court, not covering the defalcation of Linn, the plaintiffs instituted suit at law, to the December term of this Court, 1844, against William Thomas, as administrator, &c , of Joseph Duncan, the executors having resigned or ceased to act; and, at that term, recovered judgment against the administrator, *de bonis testatoris*, for the sum of $48,151 61.

In February, 1846, the United States filed a bill in this Court setting forth most of the facts detailed above, and asking for a discovery of the title papers and estate of Duncan; insisting upon the priority of the plaintiffs; and praying for an account of the money due the United States; of the personal estate of Duncan; and of the value, rents and profits of the real estate; and that, if the personal estate was not sufficient, the real estate might be sold to pay the debt due the plaintiffs. To this bill, the widow, heirs, executors, devisees, &c., of Duncan were made parties. During the progress of the cause, the value of the widow's dower was agreed upon and amicably settled, and she relinquished. Answers were put in by the defendants, and at the June term, 1846, a decree was rendered in favor of the United States, for the sum of $49,156 15, (that being all that was due, except what had not been collected under the judgments of 1841,) and ordering the real estate of Duncan to be sold, and the proceeds to be paid to the United States, "first paying prior liens, if any."

Under this decree, various sales of real estate out of Morgan county have taken place, under the direction of a commissioner, from which very considerable sums have been realized, part of which have been paid over to the United States, but there remains the sum of $4,052 00, subject to the order of the Court.

Personal property, to the amount of $300 00, was sold under the judgment of 1844.

There were two judgments recovered against Duncan in his life time, in the Circuit Court of Morgan county, of this State, one by McConnel *et al.*, for $333 76, in November, 1841, and the other by Matthews for $497 35, in March, 1842. On the 10th of November, 1845, Doremus, Suydam & Nixon, filed a bill in the same Court against William Thomas, administrator, &c., of Duncan's estate, alleging that certain personal property which the executors of Duncan had sold, and the proceeds of which, amounting to $960 60, it seems they had applied to the payment of taxes on real estate and expenses of administration, belonged to a firm of which one James M. Duncan and Joseph Duncan, in his life time, were partners, and that the plaintiffs were creditors of that firm, and claiming that they (Doremus, Suydam & Nixon) should be repaid the sum so used by the executors, and that they should be substituted in their place ; insisting it was a favored claim. James M. Duncan, also one of the sureties of Linn, was party to this bill, but he was insolvent. The administrator, in his answer, denied the partnership, and referred to the claim of the United States, and their priority, and to the proceedings in this Court, which he set forth at length, but the Circuit Court of Morgan county, by a decree rendered on the 17th of November, 1847, found that the partnership did exist, as stated in the bill ; that at the death of Duncan, the goods and chattels referred to, and the proceeds of which had gone into the hands of the executors, were liable for the partnership debts, wherever traced, and ordered that the plaintiffs should be paid out of the estate of Duncan. To Doremus & Nixon $766 48 ; to William A. Ransom & Co., $194 12. The latter had been made parties, and Suydam had died pending the suit. The Court further adjudged, that inasmuch as it did not appear the administrator had any assets in his hands, he should pay the above sums out of assets thereafter to come into his hands, or which might remain in his hands after the settlement of his accounts as administrator. It

is proper to add, that an objection was made in the answer of Thomas, because the United States were not parties, but the Court decided it was not necessary to make them parties.

It was conceded that the judgments of 1841, rendered in this Court, were a lien on all the real estate of Duncan, within the State, that the decree of June term, 1846, operated to the same extent, upon the real estate in the hands of the heirs, devisees executors, &c., of Duncan ;* and that the judgments of the Morgan Circuit Court, operated only upon real estate within the county of Morgan. The judgments and decree entered in the Circuit Court of Morgan county, are yet in force, not being paid or satisfied, except some partial payments hereafter mentioned.

The judgments at law, of this Court, recovered in 1841, being paid only in part, the United States in 1847, issued alias executions on those judgments, and the marshal levied them on lands lying in Morgan county of which Duncan died seized, and they were sold by the plaintiffs.

Joseph Duncan, at the time of his death, did not possess sufficient property, including real and personal, to discharge the debt he owed the United States, the lands out of Morgan county, not bein⁄ of value enough to satisfy the decree of June term, 1846. And it does not appear that there was more than sufficient property in Morgan county, to meet the balance due on the judgments of 1841, of this Court.

In this condition stood the cause, when, on the 15th of June, 1847, McConnel *et al.*, and Matthews filed their petitions in this Court.

The petition of McConnel *et al.*, alleges that under the decree of 1846, sales of lands, without the county of Morgan, had taken place, upon which had been made $3,555 20, which, it insists ought to be, as to the lien of their judgment, a credit on the judgments at law, of the United States of June, 1841 ; that there are

---

* The opinion of the profession in Illinois, is so general in favor of the doctrine that the lien of judgments of the United States Court, is co-extensive with its jurisdiction, as stated in the text, it was not controverted on the argument. See the question discussed in a report which was confirmed by the Circuit Court of the U. S. for the Eastern District of Pennsylvania, contained in the case of Bayard *v* Lombard *et al*, 9 Howard's Reports, 530. The Supreme Court of the United States, held that the decision of the Circuit Court was final and conclusive under the circumstances, and could not be reviewed, consequently, no opinion was given as to the lien of judgments obtained in the Circuit Court of the United States. Wallace Jr. R., 196, S. C.

lands out of the county of Morgan, more than sufficient to satisfy those judgments, and that the United States are proceeding to sell real estate in Morgan county. The petition calls for the interposition of the Court to arrest the sale; to marshal the securities so as to give them the benefit of this lien, by throwing the judgments of the U. S. of 1841, upon lands out of Morgan county, and that the sum made $3,555 20, be applied upon these judgments.

The petition of Matthews is, in all respects similar to that of McConnel *et al.*

A *fi. fa.* had issued on the judgment of McConnel, and $60 00 had been obtained on it. A *fi. fa* had also issued on the judgment of Matthews, and real estate had been levied on and $393 made by the sale of it. The executions were issued in each case within a year after the judgments were obtained respectively.

On the 23d of December, 1847, Doremus & Nixon, and A. Ransom, & Co. likewise filed a petition setting forth most of the facts hereto'ore mentioned, and alleging that this Court had taken full administration of the estate of Duncan; that their decree of the Morgan Court of November, 1847, had been rendered useless; that there was no priority of payment to the U. S. till the estate was ready to be disbursed; that taxes and costs of administration were to be first paid; that under the cir-umstances they stood as the State and individuals, and were elected with their rights; that there was more real estate to be sold, and their partnership fund had increased the amount to be disbursed in this cause, and asking that their decree be paid out of moneys received from the sale of real and personal estate, or, if that be not proper, that the commissioner of this Court be ordered to sell land enough to satisfy the sum named in their decree, and pay it over to them.

Various supplemental petitions were filed by all the parties, from time to time, bringing before the Court the proceedings that have since taken place in this cause, and particularly stating, that other lands out of Morgan county had been sold under the decree of June, 1846, and the money received, and that the sum of $3,789 56, was made by sale of land in Morgan county under the judgments of 1841.

The petition of O'Donoghue, which was filed on the 10th of January, 1849, states that he had purchased a lot of land at a

sale made by the commissioner in this cause, which lot was sold as a part of the estate of Duncan; that he paid the commissioner for it, and that Duncan had no title to it, having before his death by deed duly recorded, conveyed it to the Illinois College. And he seeks to have the sale by the commissioner to him annulled, and to have the money paid by him reimbursed out of the fund in Court.

When these petitions were presented, this Court, without determining the questions sought to be raised by them, ordered that a sufficient fund should be reserved to satisfy their claims, which was to be paid to the petitioners, provided the Court should be of opinion upon the final disposition of the cause, that the parties were entitled to receive the amounts they sought. And there is now a fund of more than four thousand dollars awaiting the decision of the questions presented by these petitioners.

These are the material facts.

The applications were once heard before the former Judge of this Court. but no decision was given or order entered. They have, therefore, been fully argued before me, and it now becomes my duty to announce my opinions upon the different questions presented.

The counsel of the United States not denying the allegations contained in the petitions, insists that the petitioners are not entitled to the relief they seek, nor to any relief.

As the petition of O'Donaghue stands upon a footing entirely different from the others, it may be convenient to consider that first.

The sale, under which he purchased the lot, was made by the order of this Court, and it is well settled that in all judicial sales there is no warranty, but that the rule of *caveat emptor* applies; Owings *v.* Thompson, 3 Scam., 502. If there be fraud or concealment, or any unfair dealing, that may be a ground for an application to a court of equity; otherwise the purchaser must look to the soundness of his title. This is the established rule in England, and throughout the United States, and it should be peculiarly applicable here, where it is so easy to trace the title to real estate, the sources, in nearly all cases, being the public records of the country. It is true, where a plaintiff, in an execution, purchases a tract of land belonging, apparently, or which he supposes to belong to the defendant, and there is in fact, no title,

a Court will interpose and place the parties in their former condition. But that is because it is a matter between themselves, the purchaser having neither benefited nor injured any third person; and it has been decided, that where there was no fraud, and a stranger to the execution purchased a piece of land as the property of the defendant, when he had no title, a court of equity would compel the judgment debtor to refund the amount to the purchaser, on the ground that his purchase had paid the debt. But no case has been shown, in which, under such circumstances, the purchaser could call upon the plaintiff in the execution to refund the amount. Indeed, the case just mentioned, is conclusive that he could not, for it is because the sale must so far stand as to enable the plaintiff to retain the money paid, that the defendant is liable. It could make no difference, that the money, instead of being in the hands of the party, was held by the officer, or paid into Court. In either case, it would seem, the right of the party to the fruits of his judgment, could not be contested. But conceding that, this last position may be questionable, still, after the money has actually been paid to the party, it is beyond the reach of the purchaser. Here the moneys paid by the petitioner has been received by the plaintiffs, and he seeks to make another fund, now in Court, arising from the sale of other property belonging to the estate of Duncan, liable to his claim.

On the part of the petitioner, the Court was referred to Lansing *v.* Quackenbush, 5 Cowen, 38 ; a case where the defendant had represented he was the owner of lots, which the party purchased, and it turned out he was not. On application to the Court, they said there was a remedy, but that it was in equity. Here was a false statement, and if the plaintiff were not a party to it, the remedy would be against the defendant. Adams *v.* Smith, 5 Cowen, 280, was also referred to. In this case, the sheriff had sold personal property which did not belong to the defendant, and the real owner sued the sheriff and plaintiff jointly and recovered. The Court allowed the amount made on the sale, and endorsed on the execution, to be stricken out, and an execution to issue for the amount of the original judgment. In this case, it was personal property, and the owner resorted to the remedy which the law gave him, the property remaining with the purchaser. Both cases are very shortly reported and clearly distinguishable from the present. But the Supreme Court of Illinois

have held under somewhat similar circumstances, there was no remedy against the plaintiff in the execution. A party purchased some property under an execution. A stranger sued for and recovered the property from the purchaser. The latter then brought suit against the plaintiff in the execution, to recover back the purchase money. The Court decided that the plaintiff was not liable. England *v.* Clark, 4 Scam., 486. These were all cases of personal property, but in a sale of real estate under execution no action is brought, because if the property of A. is sold on an execution against B. the title to the property is unchanged, and A. ordinarily suffers no wrong.

In a very recent case, however, Dunn *v.* Frazier, 8 Blackford, 432, this question was directly decided. That was a much stronger case than this. A judgment had been obtained, and an execution was issued and returned *nulla bona*, and afterwards the judgment creditor filed a petition, alleging that the judgment debtor was the owner of certain real estate in fee simple. On the application of the petitioner, the Court ordered the real estate to be sold on execution. It was sold accordingly, and Frazier became the purchaser. One of the administrators of the judgment debtor was present at the sale, and solicited Frazier to buy, assuring him that the title was good. Various proceedings took place, during which, Dunn, the judgment creditor transferred the judgment to one Adams, and Frazier refused to pay the purchase money. Another execution was issued which was enjoined. Finally, Frazier paid part of the money to Adams, and the remainder into Court, (to the clerk.) The judgment debtor had no title to the property. These facts being made to appear to the Court below, by bill in chancery, it ordered the money to be paid back to Frazier, but the Superior Court of Indiana, reversed the decree, on the distinct ground, that a purchaser who buys lands and pays the money, the judgment creditor receiving it, cannot recover it back from the creditor, either at law or in equity, merely because the judgment debtor had no title to the land. The proper course in such a case, was to proceed against the judgment debtor, or his estate, by bill in equity. And even in relation to the money in Court, it depended altogether upon the fact, whether there was any thing due on the judgment, or it was an overplus, in which last event it might be paid over to the purchaser. And see Warner *v.* Helm, 1 Gilman, 220.

It will be seen, therefore, from these principles and authorities, the .petitioner, while he has no claim upon the fund now in Court, has a remedy against the estate of Duncan. That it may be unavailing is his misfortune. If the petitioner obtain the money he has paid, it must be by the voluntary act of the plaintiffs, and not by the order of this Court.

Let us now proceed to consider the petition of Doremus & Nixon, and A. Ransom & Co. They insist that, inasmuch as there was a partnership between James M. and Joseph Duncan, and the executor of Joseph Duncan, had used the partnership goods to pay the taxes on his real estate, and the expenses of administration, they, as creditors of the partnership, have a right to be repaid out of the fund in Court.

There can be no doubt that the partnership effects are primarily liable for the partnership debts, and that those effects ought not to be appropriated to the payment of the separate liabilities of one of the partners. And if the executors knowingly diverted them, in the manner charged in the bill filed in the Circuit Court of the State, they acted illegally. But conceding this, it does not follow that the partnership creditors thereby obtained a lien upon the separate property of Duncan. No authority has been referred to which shows that if one partner withdraws funds from the partnership, and pays the taxes on his private estate, the creditors of the firm thereby acquire a lien on the land, unless, indeed, the decree on which the application now under consideration is founded, may be so regarded. All that can be said is, that the estate of the partner becomes liable to the creditor of the firm. The estate of the partner is still his own private property, and in case of his death, passes to his heirs or devisees, subject, if he had used the partnership funds for the purpose mentioned, to that debt as to others. Story on Part., § 97, 326, 358, 359, 360 & 361. Neither could the use of the partnership funds, by the executors, in the expenses of administration, create any lien upon the estate. It would still be a debt due from the estate. And, if the creditor of the firm was placed in the condition of those individuals to whom those expenses had been paid, it is doubtful, whether that circumstance, for reasons presently to be given, would affect the question.

It has been decided that the priority of the United States does not reach the property of a partner in partnership effects,

so as to pay the separate debt of one of the partners, (he being the debtor of the United States,) where the partnership property is not sufficient to pay the debts of the firm. U. S. *v.* Hack, 8 Peters, 271. But that proceeds upon the presumption that they are partnership effects. It is plain, if they had ceased to be such, and had become the separate property of the one indebted to the United States, the doctrine would be different. The true test would seem to be, whether the property belonged to the firm or the individual.

Now it is to be remarked, that these petitioners did not ask the Court of Morgan county to do more than to declare the partnership, and to decree the payment of the partnership debt, out of assets which were at that time, or thereafter to be, in the hands of the administrator. They claimed at most, not a lien on the estate, but a priority of payment out of the estate. And the Court, though it expresses the opinion, that the proceeds of the partnership effects were liable to the debts of the petitioners, wherever they could be traced, decides they were to be paid out of the estate of the testator. Accordingly, in whatever light we may regard this decree of the Circuit Court of Morgan county, it is clear it intended that payment of the debts was to be made out of Duncan's estate, when there should be sufficient assets for that purpose in the hands of the administrator. The Court does not even decree that the petitioners shall be first paid; but there is an alternative, that they may be paid when the administrator, upon the settlement of his accounts as such, shall have money then remaining in his hands. The decree did not create any lien, specific or general, upon any fund, nor upon the real estate of the testator, as it probably could not; and it does not vary essentially from the usual judgment against an administrator, for the debt of a deceased party.

Though an objection was taken to the proceedings in Morgan county, because the United States were not made parties, it is said that the decree is binding on them in this Court, in this application on the part of the petitioners. Let us now examine this position, and endeavor to ascertain whether this is so.

At the time of Joseph Duncan's death, his indebtedness to the United States, except the balance due on the judgments at law of this Court of 1841, did not constitute a lien upon his real or personal estate. The plaintiffs had only a right to a

priority of payment. And it may be admitted, for the purpose of this argument, that their priority did not extend, in point of law, so as to operate upon the real estate of which Duncan died seized, in the hands of heirs or devisees. But at the time the petitioners filed their bill in the Circuit Court of Morgan county, there was a judgment of this Court against William Thomas as the administrator, with the will annexed, &c., of Duncan; and at the time the final decree was rendered in the Circuit Court of Morgan county, there was, and had been, for more than a year, a decree standing in this Court, which took effect upon all the real estate of Duncan within the state, and directed it all to be sold for the payment of the debts of the United States, first paying prior liens. When this decree was rendered, in June, 1846, the claims of the petitioners were certainly not a prior lien, binding the estate. If, then, we give effect to the decree in the State Court, we are not the less bound to give full effect to the judgments and decree in this Court; and we will now proceed to show, that it must be considered subject to those of this Court; that under the law and by virtue of the proceedings here, the decree of the Circuit Court of Morgan county could not become operative until the claims in this Court were satisfied.

The petitioners have not sought to enforce their decree in the State Court; indeed, so long as there is nothing in the hands of the administrator, it could not, by its terms, be enforced. They come into this Court, and request its action upon their claims.

By the fifth section of the act of 3d of March, 1797, it is provided that when any revenue officer, *or other person,* hereafter becoming indebted to the United States by bond or otherwise, or shall become insolvent, or where the estate of any deceased debtor, in the hands of executors or administrators, shall be insufficient to pay all the debts due from the deceased, the debt due to the United States shall be first satisfied. 1 Statutes at Large, 515. This applies to two classes of debtors—those who are insolvent, and those whose estates, in the hands of executors or administrators, are not sufficient to discharge all the debts due from the estate. It was intended to reach the property of the debtor, whether living or dead. It has been decided that this section is applicable to all debtors of the United States. Joseph Duncan's estate was the estate of a deceased debtor of the United States; and when it came within the other requisition of the act—that is,

whenever it came into the hands of executors or administrators—then the operation of the law was complete. The doctrine of the Supreme Court of the United States, as founded on this law, and on a similar one, (act of March 2d, 1799, sec. 65,) as it respects this point is, that the party, whether assignee, executor or administrator, into whose hands the estate of the two classes of debtors mentioned passes, becomes a trustee for the United States; and from the fund in his hands, they must first be paid. Blaston *v.* The Farmers' Bank of Delaware, 12 Peters, 102; Brent *v.* Bank of Washington, 10 Peters, 596. If it be admitted that the priority of the United States did not extend to the real estate of Duncan, in the hands of heirs or devisees, as already stated, because it does not attach as against them, still when the real estate or the proceeds thereof passed to or vested by law in the hands of the executors or administrators, the priority did attach. United States *v.* Crookshank, 1 Edwards' Chancery R., 233. Consequently, whenever the proceeds of any real estate, or any personal estate, came into the hands of Thomas as the administrator, he, having notice of the debt due the government, became a trustee for the United States, and was obliged to pay them first, independent of the judgment of December term, 1844, and the decree of June term, 1846, of this Court. These merely determined the amount of the debt, but in no degree changed his duty in the premises.

It is to be observed, that this law of Congress supersedes all state laws upon the subject of the distribution of those estates that come within its provisions. The language of the Supreme Court of the United States, in Thellason *v.* Smith, 2 Wheaton, 396, is, that there is no exception made by the law, in favor of a particular class of creditors. And the same Court, in Conrad *v.* Atlantic Insurance Company, 1 Peters, 444, say, that the priority of the United States does not yield to any class of creditors, however high may be the dignity of their debts. It follows, then, if these principles are correct, that the claims of the petitioners cannot bind any funds in the hands of the administrator, nor any lands sold under the judgments at law or the decree in chancery of this Court, nor the proceeds of the same, notwithstanding the decree of the Circuit Court of Morgan county; for whatever may be the effect of this last decree, it cannot operate, under the circumstances, so as to impair the

rights of the United States. Field *v.* United States, 9 Peters, 182.

The remaining question is as to the effect of the judgments at law of the Circuit Court of Morgan county. As the rights of the petitioners, whose claims we are now to consider, depend upon the same principle, we will examine them together. This, then, was the position of the parties. The United States had judgments, binding all the lands of Duncan throughout the State, prior, in point of time, to the judgment of McConnel *et al.*, and that of Matthews, which last two judgments, were binding only on lands in Morgan county; and the United States had a decree subsequent and subordinate to both, but which, in extent, had the advantage of operating, like the judgments of June, 1841, throughout the State. The petitioners insist they have a right to throw the judgments of 1841, upon land without the county of Morgan. They assert that at the time their judgments became liens upon the real estate in Morgan county, the United States, having also judgments which were liens upon that land, and which were, besides, liens upon lands out of Morgan county, are compelled to go upon these last mentioned lands, upon the principle well recognized and understood, that where a party has a lien for a debt on two funds, and another party has a lien on one of the funds only, a court of equity will oblige the party who has the double fund, to resort in the first instance, for payment, to that fund upon which the other party has no lien. And it is contended that the circumstance of the United States procuring a decree, binding the lands out of Morgan county, before the application is made here, can make no difference. Another principle is also invoked, which may be considered settled law in New York at least; that where there is a general incumbrance upon distinct parcels of land, and the owner aliens them at different times to different persons, the parcel last sold is to be first charged to its full value to pay the general incumbrance, and so on backwards. The argument is this: if Duncan had mortgaged all his lands in the State, to the United States, for the payment of thirty thousand dollars, and then had mortgaged his lands in Morgan county to these petitioners for the amount of their judgments, and afterwards all his lands out of Morgan county to the United States for forty-nine thousand dollars, these lands out of Morgan, being the last aliened, are, according

to the doctrine above mentioned, to be first charged with the payment of the sum first named. And it can make no difference, it is said, if instead of mortgaging the lands out of Morgan, he had mortgaged all of his lands in the State over again; because, it will be seen, in order to adapt it to this case, we must include all of the land, the decree of 1846 of this Court binding the lands in Morgan county as well as elsewhere. It is urged that these being judgments, the principle is the same.

This is stating the proposition fully, and carrying the analogy to as great an extent in favor of the petitioners, as was contended for by their counsel on the argument.

The doctrine that where a man owns different parcels of land, and transfers some of them, himself also retaining some, all the parcels being subject, before the transfer, to a general incumbrance made by him, the part which he still retains shall be applied to the payment or discharge of that general imcumbrance, rather than that which he has transferred, is founded on the plainest principles of equity. It would be manifestly unjust that those persons to whom he had made transfers, should be compelled to pay off the incumbrance, when he held land which would satisfy it. Accordingly, it has been held, under such circumstances, that the property transferred is only liable, in the event of the part remaining in the owner not being sufficient to discharge the incumbrance. On the other hand, the doctrine already mentioned, as settled in New York, that land consisting of different parcels, subject to a general incumbrance, is in equity to be charged in the inverse order of the alienation of the several parcels, has been sometimes questioned, and Judge Story thinks it is not maintainable upon principle; and inclines to the opinion that there should be contribution, in such cases, according to the relative value of the estates. Story's Equity Jurisp., §§634 *a*, 1233 *a*.

The New York doctrine was pressed very far in the case of Schryver *v.* Teller, 9 Paige, 173, and as that was cited in the argument by the counsel of the petitioners, and considered conclusively settling the principles which should govern this case, it may not be improper to give it a particular examination.

In that case, the owner of the parcels of land—one at Coxsakie, the other at Redhook—having encumbered both by judgments and each by mortgages, on the 28th of May, 1840, mort-

36

gaged the Coxsackie property, and on the 7th of July following mortgaged it again to another person. On the 9th of June, of the same year, he mortgaged the Redhook property, and again on the 12th of the same month, this last being given to the same person that held the mortgage of the 7th of July on the Coxsackie property. On the 3d of June, 1840, a judgment was docketed, which was a lien on both. The parties who held the mortgage of the 7th of July on the Coxsackie property, and those who held the mortgage of the 9th of June on the Redhook property, at different times and in different Courts, filed bills for foreclosure, and at different dates obtained the usual decrees for sale of the property, the master having reported as to the priority of the several liens. On the 2d of March, 1841, the Redhood property was sold for an amount sufficient to satisfy all the liens on it prior in point of time to the mortgage of the 28th of May, 1840 on the Coxsackie property. On the 23d of March, 1841, this last property was sold for an amount not sufficient to pay the costs of foreclosure and the mortgage of 28th of May, if the previous judgments, as well as the prior specific liens on that property, were paid out of such sale. Under these circumstances, the holder of the mortgage of the 28th of May made application to the Court for a modification of the original decree so as to throw the judgments on the surplus proceeds of the Redhook property, after satisfying all liens thereon prior to his mortgage. The Court allowed the application, on the ground that as the Redhook property was more than sufficient to pay all liens on it prior to the date of the applicant's mortgage, in case the judgment creditors, who held liens at that time, sought to enforce them on the Redhook property, if the applicant paid them, he would have a right in equity to insist on an assignment of them, so that he might have a repayment out of the surplus proceeds, in preference to those who had liens on that property accruing after the date of his mortgage. For instance, the judgment creditors had liens on both properties, when his mortgage was taken on one. (Coxsackie.) If, in enforcing those liens, it would prejudice his mortgage, he would have a right in equity to compel them to go upon the Redhook property, because, certainly, he could be in no better position by taking an assignment of the judgments, than those who held them. Let us suppose the case put, had actually happened; that the applicant had pur-

chased the judgments; then he would be the holder of judg-
ments binding on both properties, and of a mortgage on one.
The doctrine of the Court is, that in this condition, he could go
upon the Redhook property to satisfy his judgments, in prefer-
ence to one who had a lien on that property accruing after his
mortgage. The Court illustrated it by saying, if there had been
a mortgage on both properties, and it had been forclosed, the
decree would require the property to be sold separately, and the
proceeds so to be marshalled as to pay general liens on the whole
out of that part of the fund arising from the sale of the Redhook
property, thus far giving the applicant the benefit of his priority
on the Coxsackie property, over a subsequent incumbrancer of
the Redhook property.

In the case just cited, there was a general incumbrance, bind-
ing both parcels, also specific incumbrances binding each, and a
transfer made of one, and then the other; and it seems to proceed
upon the principle that, inasmuch as at the time when the trans-
fer was made of one of the parcels, the party would have the
right to compel the general incumbrancer to go upon that parcel
not affected by the transfer, no subsequent act of the owner in
relation to that other parcel, could change his rights. Whether
it would make any difference, if the general incumbrance and
the transfer of the second parcel were held by the same person,
does not appear; but it is certain, he would, in one sense, come
within the qualification or limitation of the rule laid down by
Judge Story. He says, that though the rule, that is, if a creditor
has two funds, he shall take his satisfaction out of that fund upon
which another creditor has no lien, is so general, it is never ap-
plied, except when it can be done without injustice to the person
who has the double fund, as well as the debtor. It is never done
when it trenches upon the rights, or operates to the prejudice of
the party entitled to the double fund. Equity Jurisprudence,
§ 558, 559, 560, 633. The object is to satisfy both creditors. It
is apparent, however, whenever the double fund is insufficient
to pay all the claims against it, and the same person has a right
to proceed against both, and against one alone, it does affect the
right of the party entitled to the double fund. For example, in
this case, the United States have a general lien on different par-
cels of land; creditors, the petitioners, have also a general lien
on some of the parcels; and the United States have a lien which

may well be considered specific upon all the parcels. Now it is plain, if the creditors turn the general lien of the United States over to the lands not bound by the lien of the creditors, under the facts of this case, it diminishes, by so much, the fund which is to satisfy the decree of 1846. In other words, whatever is paid to the petitioners is an absolute loss to the plaintiffs. Notwithstanding such would be the effect, in this case, upon the party entitled to the double fund, it may be questionable whether the circumstance of taking a subsequent lien, would or ought to place them in a better position; certainly not, if the true reason be given for the rule, in the case in Paige. To apply the argument of that case to this; if these petitioners had paid off the balance due on the judgments of the plaintiffs of 1841, they would have the right in equity, to insist upon an assignment thereof.

The case of Schryver *v.* Teller, if we admit that it was rightly ruled, must be regarded as deciding that a general lien will be thrown upon a particular parcel of land so as to give a party having a mortgage the benefit of his priority over subsequent incumbrances, either of the whole or a part; that is, where the question is dependent upon priority of time alone. But it does not follow that this would be the rule where there is a priority of right, that is in a case where the parties, as such, do not stand upon an equality of right.

Let us, therefore, examine how far the character of the parties in this case, affects the question. The plaintiffs constitute the sovereign power of the country, and, according to the jurisprudence of most States, under certain circumstances, are entitled, as a creditor, to peculiar privileges. It was so under the Roman law; is so under the law of England, and under our own.

We must bear in mind, that the statutes giving the government a priority, are presumed to have for their object the public good, and are, therefore, to be liberally construed. United States *v.* State Bank of North Carolina, 6 Peter's, 29; Beaston *v.* Farmers' Bank of Delaware, 12 Peters, 134.

The application was presented in this case, after a levy had been made by the United States, upon lands in Morgan county, under executions issued on the judgments of 1841. The lands were sold and the moneys appropriated upon those judgments, subsequent to the filing of the original petitions, as appears by the supplemental petitions. This Court did not interfere with the pro-

United States *v.* Duncan *et al.*

ceedings under the executions, but suffered them to continue, and directed that there should be reserved a sufficient fund to meet the claim of the petitioners, from what might be made by the sale of lands in this case. The rights of the petitioners ought, perhaps, for that reason, to be considered the same as if the money arising from the sale of the Morgan lands had been paid into Court, subject to its order herein. And, apparently, it should be governed by the same principles as if the petitioners, instead of pursuing the course they have, had applied to a court of equity to restrain the proceedings on the executions, waiving for the purpose of the supposed case, all objections on account of sovereignty, and the United States had come and given, in answer, the decree of 1846; the indebtedness of Duncan's estate; in fine, stating all the facts and claiming a priority of payment under the law.

It would seem upon principle, as well as by the authority of adjudged cases, if we throw out of view the decree of 1846, and the question of sovereignty, there could be nodoubt of the right of the judgment creditors to compel the plaintiffs to look to lands out of Morgan county, not bound by their lien, for the satisfaction of the balance due the United States, upon the judgments of 1841, for in that case, there would be property sufficient to pay both. It is true, technically speaking, the petitioners, if they paid the judgments of 1841, could not compel the plaintiffs to assign those judgments to them, because they could not strictly reach the United States. Hill *v.* United States, 9 Howard, 386. But if this difficulty were avoided, the question is whether the decree of 1846, which operated specifically upon lands not affected by the judgments of the petitioners, changes the principle.

It must be conceded the question is not free from embarrassment, in consequence of the difficulty of extracting from the various cases which have been decided, the true rule of interpretation of the acts of Congress, laid down by the Supreme Court.

.The petitioners had taken out executions on their judgments, within a year after they were rendered; on one some real estate, not in question here, had been sold; on the other, a small payment had been made; as to the balances due on them respectively, the judgments became general liens.

It has been uniformly held, in all the cases, that the priority of the United States, does not disturb any specific lien, nor the perfected lien of a judgment; that is, it does not supersede a

mortgage on land, nor a judgment made perfect by the issue of an execution and a levy on land. Thelluson *v.* Smith. 2 Wheat., 396; Conard *v.* Atlantic Insurance Company, 1 Peters, 386.

But in the case of a general lien it is not so clear. The case of Thelluson *v.* Smith, if it is not considered, as in some respects, overruled by the case of Conard *v.* The Atlantic Ins. Co., certainly establishes the doctrine that the priority of the United States does not yield to a judgment which is a general lien upon real estate. The facts were, that Thelluson and others, recovered a judgment against Crammond, which, it was admitted by the Court, was a lien upon his lands on the 20th of May, 1805. Afterwards he made an assignment of all his estate, being insolvent, and in debt to the United States, so as to bring him within the operation of the acts of Congress. The United States subsequently brought suit against him, had judgment, sued out execution, levied on and sold an estate, called Sedgeley, admitted to be bound by the judgment of May 20, 1805. The marshal having received the proceeds, Thelluson *et al.*, brought suit against him. They had not issued execution, nor levied on the estate by virtue of their judgment. One of the questions made in the case was, whether the United States were entitled to be paid in preference to the judgment creditor? This the Supreme Court decided in the affirmative, concluding by saying; "a judgment gives the judgment creditor a lien on the debtor's lands, and a preference over all subsequent judgment creditors. But the act of Congress defeats this preference." This was under the act of 1799, but we have already seen, that in this respect, it is like the act of 1797.

This case was particularly examined and reviewed in Conard *v.* The Atlantic Insurance Company. It is there said, that Thelluson *v.* Smith was a case where a judgment creditor sought to recover the proceeds of a sale of land made under an adverse execution, on the ground that he had a general lien by judgment on the land; and in such circumstances the action was not maintainable. The real ground of the decision, the Court says, was, that the judgment creditor had never made his lien specific; that he had no title to the proceeds as his property; and if they were to be deemed general funds of the debtor, the priority of the United States attached; that a mere lien on land did not convey the legal title to the proceeds of a sale, made under an

adverse execution: the case did not establish the principle, that a specific lien could be displaced by the priority of the United States; because that priority was not, of itself, equivalent to a lien. Judge Johnson, in his separate opinion, says, that he never acknowledged the authority of the case of Thelluson *v.* Smith, on the point supposed to be decided by it—the precedence of the debt of the United States, as to a previous judgment, in the case of a general assignment; and that he concurred in it, only because of the want of priority between the parties. He thought the sale of the Sedgeley estate under the execution was a nullity, because the assignment of Crammond divested all his interest, so as to place it beyond the reach of the execution issued on the judgment of the United States. Suppose, however, the assignees in whom the estate had vested—admitting it had vested—had sold it notwithstanding the lien; then, according to my understanding of the case of Thelluson *v.* Smith, even as corrected and explained in Conard *v.* The Atlantic Insurance Company, the proceeds of the sale in the hands of the assignees, would have been subject to the priority of the United States. As, in this case, if the lands in Morgan county had been sold by the executors or administrator, under the authority of the will or of the law, the proceeds would have been liable, not to the judgment creditors, (the petitioners,) but to the United States; it being understood in all such cases, that the executor or administrator in whose hands the proceeds were, had notice of the debt due the government.

In Conard *v.* The Atlantic Insurance Company, the Court are careful to say, the priority of the United States does not affect any specific lien; but in the case of Brent *v.* The Bank of Washington, 10 Peters, 596, the Court state, that it has never been decided that the priority of the United States affects any lien, *general* or specific, existing when the event happened which gave them priority.

Suppose, then, the case of Thelluson *v.* Smith may be considered as shaken, and, indeed, overruled—about which some doubt may be entertained—so far as it gives a preference to the United States over the general lien of a judgment creditor; it would follow that the judgments of these petitioners would not be affected by the mere force of the statute of 1797; and, possibly, we might go farther, and say they would not be affected by any

mere judgment or decree in favor of the United States, on the indebtedness of Duncan's estate, rendered after the date of the judgments of the petitioners. But this Court is asked to go even farther; to say that the United States shall forego their lien of 1841, superior to that of the petitioners, as to the lands in Morgan county, and release a part of the lands bound by their decree of 1846, out of that county; so that the petitioners may be paid in preference to the plaintiffs. This, it seems to me, cannot be done. The United States are entitled to all their legal rights; and, in the case supposed of an application to a Court of Equity, to say to the judgment creditors: We will enforce our lien of older date than yours, made specific by a levy before you applied to the Court: we will retain our lien under the decree of 1846 upon the lands out of Morgan county: we are not to be regarded as ordinary individual creditors of the estate; your rights must yield to ours. The same answer to the application of the petitioners, must be given in this Court. If they have a lien, so have the United States; and to decide that under the circumstances of this case, the latter could not enforce their judgments of 1841, would be to say, in effect, they had no priority of payment at all; but that they must stand upon an equal footing with all other creditors; to prevent which was the very object of that portion of the statutes of 1797 and 1799, already referred to.

We have been told their lien cannot be displaced by that which is not a lien—the priority of the plaintiffs. It is not. There is not only a priority, but that priority has been perfected into specific liens. If it be said, that, discarding the decree of 1846, the United States might be regarded as individuals, and thrown on the lands out of Morgan county for the satisfaction of their judgments of 1841, and they ought consequently to be treated in the same manner, notwithstanding that decree: if the first could be done, the other would not necessarily follow; and the reason is—in the former case the United States would be paid; in the latter, not; and the law is imperative they shall be *first* paid, when the estate of any deceased debtor, in the hands of administrators or executors, is insufficient to pay *all* the debts due from the deceased. And certainly, the lands of the deceased debtor, when these petitioners made their application to this Court, were as strongly bound by the priority of the claim of

the United States, as the proceeds of them would have been, in the hands of executors or administrators.

The laws of the United States giving a priority to the government, are of general application in the cases therein stated; and if a debtor is to be excepted out of the general rule, it devolves upon the party alleging the exception, to show it. I think these petitioners have not satisfactorily established their right to be withdrawn from the ordinary predicament of creditors, when they come in competition with the claims of the government. In all such cases, it is manifest Congress intended to give priority of payment to the United States, over all other creditors. Beaston *v.* The Farmers' Bank of Delaware, 12 Peters, 134.

Admitting that the question is not free from difficulty, yet I have not been able to arrive at any other conclusion than that which is here announced. It is sometimes a hard rule, undoubtedly, upon individual creditors and upon families, that a man's whole estate should be swept away, to pay a debt due to the government; but Courts of justice can only expound and apply the law; and if, upon a fair and impartial examination of the subject, they can ascertain its intent and meaning, their duty is simply to administer it, as it becomes applicable, in the various relations of life, to the rights and interests of the parties before them.

ARCHIBALD WILLIAMS, District Attorney, for the Pltffs.

D. A. SMITH & WM. BROWN, for the Petitioners.